[Civ. No. 24519.   First Dist., Div. Three.   Feb. 26, 1968.]

ROGER JESSUP et al., Plaintiffs and Appellants, v. CATTLE CENTER, INC., Defendant and Respondent.

Gill & Bowles and S. B. Gill for Plaintiffs and Appellants.

Mack, Bianco & Means and D. Bianco for Defendant and Respondent.

SALSMAN, J.—The plaintiffs-appellants, Roger Jessup and Marguerite Rice Jessup, partners, and Marguerite Rice Jessup, trustee, doing business under the firm name of Roger Jessup Farms, sued the defendants, Bill W. Center, doing business as Center Livestock Company, and Cattle Center, Inc., for damages for fraud and conversion. The trial court entered judgment in favor of plaintiffs against the defendant Bill Center in the sum of $21,618.90, but decreed that plaintiffs take nothing against the defendant Cattle Center, Inc. Plaintiffs appeal only from that portion of the judgment which denied relief against Cattle Center, Inc.

On March 4, 1964 appellants were the owners of 159 head of cattle. On that date they sold their cattle at their ranch to the respondent Bill Center, a cattle dealer. At the time of sale Bill Center as the buyer, issued his "bill of sale draft" in the amount of $19,616.22 payable to appellants and drawn on the First Western Bank. At the time the draft was issued,

Bill Center did not have funds with which to meet his draft and knew the draft would not be paid when presented.

Appellants' cattle were loaded onto trucks at the ranch. Appellants caused the cattle to be inspected by a brand inspector of the State Department of Agriculture, and that official issued a brand inspection certificate showing purchase of the identified cattle from appellants and their consignment to respondent Cattle Center, Inc., a cattle auction yard. The shipping orders accompanying cattle also noted the consignment of the cattle to Cattle Center, Inc., for the account of Bill Center.

There was evidence that from time to time Bill Center had large numbers of cattle on hand, awaiting sale, and that at the time of this transaction the bank against which he drew his draft had cut off his line of credit because he had more cattle on hand than the maximum limit he had agreed upon with the bank. There was also evidence that officers of Cattle Center, Inc. were informed of this.

The cattle were received at respondent's auction yard, and five days later respondent sold them in the regular course of business to a bona fide purchaser. Respondent dealt with the cattle believing in good faith that they were owned by Bill Center. Respondent advanced money to Center against them. Respondent relied upon Center's possession of the cattle, and upon the brand inspection certificate and shipping orders as evidence of Bill Center's title. There was evidence that such reliance was customary. Respondent paid over the net proceeds of the auction sale to Bill Center without knowing exactly how Center had paid for the cattle.

The trial court concluded that appellants were entitled to judgment against Bill Center because of his fraudulent representation that his draft would be paid when presented, but that they were estopped by their conduct from asserting title to the cattle against Cattle Center, Inc., the auctioneer.

■ Appellants' main contention is that an auctioneer who innocently sells property on behalf of one who acquired title by fraud is liable to the true owner for the value of the property. If this proposition is accepted, respondent would be liable to appellants for the value of their cattle.

■ The rule is clearly established and widely followed that where an auctioneer sells stolen property at auction in good faith and without knowing that it is stolen he is nonetheless liable to the true owner for the value of the property. (*Rogers* v. *Huie*, 1 Cal. 429 [54 Am.Dec. 300]; *Swim* v. *Wil-*

*son,* 90 Cal. 126 [27 P. 33, 25 Am.St.Rep. 110, 13 L.R.A. 605] ; *Frank* v. *Repp & Mott,* 70 Cal.App.2d 407 [161 P.2d 279] ; 6 Cal.Jur.2d, Auctions, p. 408; Annotation: Auctioneer-Liability for Conversion, 96 A.L.R.2d 208, 215, and cases cited.)

■ It is equally well settled that an auctioneer who sells property which is subject to a conditional sales contract or mortgage is liable to the true owner for its value. (*Lusitanian-American Dev. Co.* v. *Seaboard Dairy Credit Corp.,* 1 Cal.2d 121 [34 P.2d 139] ; *United States* v. *Union Livestock Sales Co.,* 298 F.2d 755 [96 A.L.R.2d 199] ; Annotation, 96 A.L.R. 2d 208, 218-221, and cases cited; 7 Am.Jur.2d, Auctions and Auctioneers, § 68, pp. 279-280.)

■ The rule is less clear, however, where the auctioneer sells property on behalf of a principal who has obtained the property from the true owner by fraud. It has been held that where the auctioneer sells with knowledge of the fraud of his principal he is liable to the true owner for the value of the property. (*Morrow Shoe Mfg. Co.* v. *New England Shoe Co.,* 57 F. 685; see also 7 Am.Jur.2d, Auctions and Auctioneers, § 68, p. 280, fn. 1, and cases cited.) Some cases have resorted to such doctrines as consent (*Bunn* v. *Walch,* 54 Wn.2d 457 [342 P.2d 211]) or waiver (*United States* v. *Sommerville,* 211 F.Supp. 843) to protect an innocent auctioneer who sells without notice of the fraud of his principal. Here, on facts before it, the trial court relied upon the doctrine of equitable estoppel to support its conclusion that appellants were not entitled to recover the value of their cattle from the innocent auctioneer. We think the trial court was correct in this view.

In *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.,* 54 Cal.2d 773 [8 Cal.Rptr. 448, 356 P.2d 192], the Supreme Court described the four elements required by the doctrine of equitable estoppel. ■ Before an estoppel can occur, (1) the party to be estopped must know the facts; (2) he must intend that his conduct will be acted upon, or act in such manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of the facts, and (4) he must rely upon the conduct to his injury. (*Id.* p. 778, and cases cited; see also *McKee* v. *Peterson,* 214 Cal.App.2d 515, 524 [29 Cal.Rptr. 742] ; *Mercantile Accept. Corp.* v. *Liles Bros. Motor Co.,* 167 Cal.App.2d 779, 785 [334 P.2d 983] ; 18 Cal.Jur.2d, Estoppel, § 5, pp 406-407.) ■ All of these essential elements are found in our facts.

At the time of sale of their cattle to Bill Center, appellants knew that the cattle were consigned to respondent's auction yard, because the shipping orders issued by the carrier so stated. They also knew that a brand inspector's certificate, which is specific evidence of ownership (Agr. Code, § 16522, subd. (b)), would accompany the cattle. Moreover, appellants transferred physical possession of the cattle to their buyer, Bill Center. All of these facts were fully known to appellants at the time the cattle were taken from the ranch to respondent's auction yard.

It is true that appellants and respondent were both ignorant of the fact that Bill Center's draft for the cattle could not be paid when presented. However, appellants did know that they were accepting a draft, payable at a later time, while immediately parting with possession of their cattle, thus putting the buyer into possession and clothing him with the indicia of title. Appellants were in the best position to inquire into their buyer's ability to honor his draft by inquiring about his credit or demanding cash or a certified check if his credit was doubtful. Instead, they merely assumed he was able to pay. Appellants were therefore in a position to learn "the true state of the facts," whereas respondent, which dealt with many dealers offering large numbers of cattle, could not reasonably be expected to investigate the exact terms of the purchase of each lot of cattle presented to it.

The foregoing facts also support the second requirement noted in *Crestline, supra,* and show that appellants, by transferring their property to the buyer and placing their cattle in the stream of commerce for immediate sale, acted in such a manner that respondent could reasonably believe appellants intended their conduct to be acted upon.

There was conflicting evidence as to respondent's knowledge of the facts. There was evidence from which an inference could have been drawn that respondent had knowledge of the conduct of Bill Center, or at least enough knowledge to put it upon inquiry as to the true facts. Bill Center was related to an official of Cattle Center, Inc., and Cattle Center Inc. had learned that Bill Center's credit had been cut off. But the inference was not compelled. There was contrary evidence, and from all of it the trial judge found that respondent acted in good faith and without culpable knowledge of the exact nature of the facts surrounding the sale by appellants to Bill Center. We must, of course, accept that finding. (*Bancroft-Whitney Co.* v. *Glen,* 64 Cal.2d 327, 348, 349 [49 Cal.Rptr.

825, 411 P.2d 921]; *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].) Thus the third requirement is satisfied.

The fourth requirement for application of the doctrine of estoppel is found in the evidence that respondent accepted the cattle in the usual course of its business and, in reliance upon Bill Center's possession, the brand certificate and shipping orders, sold the cattle at auction and accounted to Bill Center for the receipts.

Our courts have held that a bona fide purchaser for value who takes cattle directly or indirectly from an auctioneer is not liable in conversion to the true owner who has been defrauded by accepting a bad check. (*Meadows* v. *Hampton Live Stock Com. Co.*, 55 Cal.App.2d 634 [131 P.2d 591]; *Keegan* v. *Kaufman Bros.*, 68 Cal.App.2d 197 [156 P.2d 261].) In the cases cited, the true owner was estopped from asserting title to the cattle because he clothed his buyer with the indicia of title, upon which the subsequent good faith purchaser relied. We hold the same rule applicable to the innocent auctioneer. (See *Guckeen Farmers Elevator Co.* v. *South Soo Grain Co.*, 172 Neb. 426, 429 [109 N.W.2d 728, 730]; cf. 41 Neb.L.Rev. 617.)

█ The doctrine of estoppel is an equitable one. It rests essentially upon the general principle that when one of two innocent persons must suffer a loss, the loss must be borne by the one whose conduct, acts or omissions brought about the injury. (Civ. Code, § 3543.) Its application to our facts is clear. Appellants could have insisted upon cash for their cattle, or they could have consigned the cattle to respondent for the account of Bill Center, subject to security to appellants for the agreed sale price, or they could have so arranged the carrier's bills of lading and the state's brand inspection certificate to reflect their own security until payment of the purchase price. But, as we have seen, none of the several available methods of self-protection was chosen. Rather, they relied entirely upon the honesty, good faith and fair dealing of their buyer. They were disappointed. But the general principles of equity to which we have adverted prevent them from shifting their loss to the innocent respondent.

The judgment is affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.