[Civ. No. 43204. Second Dist., Div. One. Nov. 12, 1974.]

CLIFTON CATTLE COMPANY, INC., Plaintiff and Respondent, v. ROBERT THOMPSON, Defendant and Appellant.

**COUNSEL**

Twitchell & Twitchell and Maurice F. Twitchell for Defendant and Appellant.

Myers, Hawley, Morley & Moore and John M. Moore for Plaintiff and Respondent.

**OPINION**

**LILLIE, J.**—Defendant appeals from a judgment awarding plaintiff the contract price of three shipments of cattle sold by plaintiff and received by defendant.

We view the evidence in a light most favorable to respondent and indulge all inferences in favor of the findings and judgment (*Grainger* v. *Antoyan,* 48 Cal.2d 805, 807 [313 P.2d 848].)

Defendant is a cattle rancher near Santa Maria; plaintiff is a Texas corporation cattle dealer. In 1970 defendant became acquainted with Andrew Cipollo when he rented a truck from Cipollo who was operating a trucking and ranching equipment rental and sales business near defendant's ranch. Thereafter the two entered into a joint venture pursuant to which defendant leased 425 acres of growing alfalfa land, and Cipollo contributed the labor of cutting and bailing the hay. Cipollo sold the hay for $5,000, but never paid defendant his half-share of the proceeds. About this time defendant purchased a new farm machine from Cipollo which subsequently was claimed by its true owner because Cipollo did not have title to it.

In September 1971 Cipollo traveled to Phoenix seeking to buy cattle which he could sell if he "could make any money off of them." There he contacted Ben Kraemer, plaintiff's agent, who showed him some of plaintiff's livestock. Cipollo returned to California where he contacted various persons including defendant, seeking to find someone interested in buying the cattle through him. Defendant agreed to buy the livestock but Cipollo informed him he did not have the money to pay for the purchase. Defendant then gave Cipollo a "bill of sale draft" which defendant signed and thereon wrote the date, "9-2-71," his address and the name and address of his Santa Maria bank, leaving the rest of the draft blank. Cipollo returned to Arizona, told Kraemer he wished to buy the cattle and delivered to

Kraemer the draft in the form entrusted to him by defendant; Kraemer "checked out" defendant's credit, and on the draft he (Kraemer) or his wife filled in plaintiff's name as payee and the number, description, total weight and purchase price of the animals sold. The cattle were then shipped to defendant through a livestock transportation company and defendant received them and signed the shipping documents on a line preceded by the printed words "REC'D. BY." Cipollo made no profit from the transaction. Shortly thereafter Cipollo purchased additional cattle from Kraemer and plaintiff, and Kraemer made out a "Statement" that the sale was made "To Andrew Cipollo." Cipollo paid for these cattle with a check drawn on "Westlake Farms" through a Santa Maria bank signed by him as payer. These cattle were delivered to defendant.

Thereafter, on October 9, 1971, Cipollo purchased 124 steers from plaintiff, 123 on October 16 and 121 on October 19, and in each instance invoices were made showing Cipollo as the buyer. Cipollo informed Kraemer that the livestock contracted for by these three purchases should be shipped to "Mr. Thompson's [defendant's] feed yard, Santa Maria." Defendant accepted delivery of all three shipments, and for each shipment signed a trucking company form below "Received Above Property in Good Order," and above "Consignee"; the form enumerated the number of animals delivered. No payment was ever made to plaintiff for these three shipments (October 9, 16, 19) which, with the freight and other undisputed charges, totaled $57,409.45.

Ultimately (December 1971) plaintiff sued Cipollo alone on common counts for the recovery of $57,409.45. Cipollo defaulted and plaintiff had a default judgment entered for this sum, no amount of which was ever paid by Cipollo. Subsequently plaintiff filed the complaint herein on the theory of conversion—that defendant had acquired the cattle knowing that Cipollo had not paid for them—but later, after examining Cipollo in a debtor's proceeding in the action taken against Cipollo, amended the complaint to include the theory of breach of contract alleging that Cipollo in buying the livestock had acted as defendant's agent.

The evidence—that Kraemer on behalf of plaintiff accepted the bill of sale draft drawn by defendant and, after checking defendant's credit, filled it in for the price of the initial cattle sale to Cipollo, then shipped the cattle to defendant; and thereafter, at Cipollo's request, plaintiff shipped the cattle for the three purchases at issue directly to defendant's feed yard which "was all right" with plaintiff since plaintiff "had previously checked out [defendant's] credit and so on"—clearly establishes that in its dealings with Cipollo plaintiff had knowledge of defendant's identity and knew

that in respect to these transactions Cipollo was acting for and on behalf of defendant. ██ ██ Therefore, by definition of law defendant was *a disclosed principal* whether the agency be actual or ostensible[1] (*Bank of America etc. Assn.* v. *Cryer,* 6 Cal.2d 485, 488 [58 P.2d 643]; *Zingheim* v. *Marshall,* 249 Cal.App.2d 736, 747 [57 Cal.Rptr. 809]; Rest. 2d Agency, § 4(1)), and appellant so concedes—"Thompson's identity was known so he necessarily would be a disclosed principal." ██ This form of relationship between Cipollo and defendant serves to negate appellant's contention that he "is still relieved from liability to Clifton because of Clifton's election to obtain judgment against Cipollo and Clifton's retention of the judgment"—referring to the circumstance that plaintiff had obtained a default judgment against Cipollo before commencing the within action against defendant.[2]

In *Zingheim* v. *Marshall,* 249 Cal.App.2d 736 [57 Cal.Rptr. 809], plaintiff obtained a judgment for $3,600 against the agent, Marshall, which remained unsatisfied; thereafter he brought an action against Marshall's disclosed principal for the same sum (both agent and principal were also sued in the second action for the recovery of another sum, under another obligation). The trial court entered judgment for $3,600 against the principal. On appeal the principal, as here, urged that by pursuing to judgment the initial action against the agent plaintiff had made an election which precluded the subsequent action against him. The court rejected the contention, affirmed the judgment and said "IN PURSUING ACTION NO. 240878 TO JUDGMENT AGAINST MARSHALL ONLY, DID PLAINTIFF ELECT NOT TO LOOK TO ROGERS AS PRINCIPAL? No. . . . Rogers was a disclosed principal. . . . 'Recovery of judgment against the agent of a disclosed or partially disclosed principal for failure of performance of a contract to which the agent is a party does not thereby discharge the principal. . . . If the agent is separately liable, the other party has two separate causes of action although based upon the same claim, and only the satisfaction of a judgment against the agent terminates the liability of the principal.' (Rest.2d Agency, § 184, pp. 417-418.)" (Pp. 747-748.) Various cases enunciating

---

[1]The language of finding 3 of the trial court is consistent with a finding of disclosed principal. "At all relevant times, defendant Thompson permitted one Andrew Cipollo to hold himself out as the agent of defendant Thompson and Andrew Cipollo were engaged in a business relationship or [of] either, principal and agent, or a partnership, and that the three loads of cattle which are the subject of plaintiff's lawsuit would be paid by defendant Thompson." Though the court in its memorandum of decision described defendant as "an undisclosed principal" we are not bound by the court's reasoning in its memorandum (*International etc. Workers* v. *Landowitz,* 20 Cal.2d 418, 423 [126 P.2d 609]; *In re Pickett,* 25 Cal.App.3d 1158, 1163 [102 P.2d 487]), particularly where, as here, defendant has conceded having been a disclosed principal.

[2]The trial court found and concluded that plaintiff had not made such an election.

a contra rule in relation to *undisclosed* principals were distinguished in *Zingheim* (p. 747). *Pratt* v. *Hopper,* 12 Cal.App.2d 291, 297 [55 P.2d 517]; *Klinger* v. *Modesto Fruit Co., Inc.,* 107 Cal.App. 97, 100 [290 P. 127]; and *McDevitt* v. *Corriea,* 70 Cal.App. 245, 255 [233 P. 381], cited by appellant all involve nondisclosed principals. The same distinction is made in section 184 Restatement Second Agency, "Comment on Subsection (1): (a) The rule stated in this Subsection is not in accord with the rule stated in Section 210 dealing with the undisclosed principal. The cases holding that a person who gets judgment against the agent after discovery of the identity of the undisclosed principal can not later get judgment against the principal, proceed upon the theory that this act indicates conclusively an election to hold the agent rather than the principal. *But there is no room for a doctrine of election in the case of the disclosed or partially disclosed principal. In this case, the third person has a contract with the principal unless he chooses the sole responsibility of the agent at the time of making the contract.*" (Italics ours.) The same distinction is drawn in *Wheaton Lumber Co., Inc.* v. *Metz* (1962) 229 Md. 78 [181 A.2d 666], wherein plaintiff sued both the agent and the disclosed principal in one action; the agent having failed to answer, plaintiff took a default judgment against him then proceeded against the principal. The trial court entered a summary judgment in favor of the principal on the ground that the obtaining of the default judgment against the agent constituted an election to hold the agent liable, exclusively. The appellate court reversed the judgment: "If this is a case of an undisclosed principal, § 210(1) [Rest.2d Agency] would apply here. . . . The appellant, however, contends that the rule above stated applies only to undisclosed principal situations, and that it cannot form the basis for a summary judgment here. We agree. . . . We think the Restatement, *op. cit.* supra, § 184 expresses the correct rule as to the case of a disclosed or partly disclosed principal. . . ."

Appellant's contention that there could be no actual agency in this case because written authority to purchase the cattle was required and none was given to him by Cipollo, is totally without merit. An agent's authorization to deal for the principal may be oral unless specifically required by statute to be in writing or (under the rule of "equal dignities") the contract the agent is authorized to execute is statutorily required to be in writing (§ 2309, Civ. Code), and we find no such statute expressly pertaining to sales of cattle or agency therefor, nor has appellant directed our attention to any. Appellant refers to Commercial Code sections 1206 and 2201; but under the undisputed evidence that he received and accepted the cattle neither section could serve to invoke the "equal dignities" rule. Section 1206 (subdivision (1) requires a writing in order for those portions of sales of personal property which are in excess of $5,000 to be "enforceable") is by subdivision

(2) expressly made inapplicable to "contracts for the sale of goods"[3] encompassed by section 2201; and section 2201, subdivision (3)(c) provides that a written contract for the sale of goods is not required "With respect to goods . . . which have been received or accepted." *Price* v. *McConnell*, 184 Cal.App.2d 660 [7 Cal.Rptr. 695], also involved a sale of cattle; in relation to the "writings" statutes regulating such sales which preceded the adoption of the Commercial Code, the court said at page 667: "Nor is there merit in appellant's contention that the contract cannot be enforced since it would violate the statute of fraud. Here the buyer actually accepted and received the cattle."

■ Defendant testified that he paid Cipollo for "all the cattle [he] received," and here directs our attention to various cancelled checks and bank drafts received in evidence[4] showing payments by him to Cipollo for the livestock, and contends that he is therefore exonerated from any duty to pay plaintiff under the provisions of section 2335, Civil Code.[5] However, there is substantial evidence from which the trial court reasonably could have inferred that in its dealings with Cipollo plaintiff did not intend to look solely and exclusively to him for payment of the cattle—in relation to the first purchase by Cipollo, plaintiff "checked out" defendant's credit and was then paid with a draft signed by defendant which plaintiff's agent Kraemer filled out, and the cattle were shipped to and received by defendant; as to each of the three transactions at issue, the cattle were ordered from plaintiff by Cipollo by telephone, Cipollo directed plaintiff to and it did deliver the livestock to defendant who received the same and, according to Kraemer's testimony, "They was supposed to be paid for by check between him [Cipollo] and Mr. Thompson. And so I previously had checked out Mr. Thompson's credit and so on, so we said it was all right." Actually the court reasonably could have drawn the same inference from the very circumstance that when each sale was made plaintiff was aware that Cipollo was the agent and defendant the principal, for under the evidence the court

---

[3]"Goods" of course includes animals. (Com. Code, § 2105, subd. (1).)

[4]It is not possible from the exhibits to reconcile these payments with the obligations here at issue, which involve three shipments all made under invoices dated October 9, 16 and 19, 1971, respectively, each expressly referring to "steers," to a total of 368 steers. The five exhibits relied on by appellant consist of a cancelled check dated September 22, 1970 (this should have been 1971) relating to "139 steers," a draft dated October 4, 1971, referring to "40 calves," a draft dated October 12, 1971, relating to a "deposit on 350 calves," a draft dated October 19, 1971, referring to "295 calves," and a check and attached draft, both dated October 21, 1971, and for the same sum, referring to "175 calves."

[5]"If exclusive credit is given to an agent by the person dealing with him, his principal is exonerated by payment or other satisfaction made by him to his agent in good faith, before receiving notice of the creditor's election to hold him responsible."

could deem it unreasonable to assume that although knowing of this relationship, plaintiff still would intend and desire that only Cipollo, and not defendant, be obligated for payment.[6] In *Standard Oil Co. of Cal.* v. *Doneux,* 192 Cal.App.2d 608 [13 Cal.Rptr. 749], judgment against the principal was affirmed despite his reliance on section 2335: "The finding of the court that Standard did not extend exclusive credit to [agent] Doneux is supported by the record." *Southern Glass Co* v. *Dairy Service Co.,* 11 Cal.App.2d 498 [54 P.2d 50]; and *Rigney* v. *De La Salle Institute,* 10 Cal. App.2d 492 [52 P.2d 579] cited by appellant are distinguishable because in each of those cases there was overwhelming evidence that exclusive credit had been extended to the agent.

Appellant claims that plaintiff is estopped to assert any claim against him under the provisions of section 3543, Civil Code,[7] because he was innocent of any knowledge of wrongdoing by Cipollo, while plaintiff was negligent in its dealings with Cipollo. While there is no evidence establishing that plaintiff at any time during the sales transactions was aware of any type of impropriety committed by Cipollo, we have found in the record, as hereinabove described, substantial evidence of wrongdoing committed by Cipollo against defendant which reasonably should have induced suspicion in defendant and caution in thereafter utilizing Cipollo as his agent in dealing with plaintiff. Moreover, it is settled that section 3543 ordinarily cannot be relied on by a principal who has utilized the services of an unscrupulous agent. In *Westberg* v. *Whittiken,* 101 Cal.App. 204 [281 P. 509], appellant principal relied on section 3543. In affirming the judgment against him the court said at page 208: "We do not very well see how a principal can plead any estoppel based upon the failure of his agent to make proper application of the money entrusted to his care." Also in *Monteleone* v. *Southern California Vending Corp.,* 264 Cal.App.2d 798 [70 Cal.Rptr. 703] the court held: "As between two innocent persons, one of whom must suffer, the loss should fall on the principal who has appointed the agent rather than on the third person who trades or deals with the agent. (*Gaine* v. *Austin,* 58 Cal.App.2d 250, 262 [136 P.2d 584]; Civ. Code, § 3543.)" (P. 808.) Appellant has relied on *Jessup* v. *Cattle Center, Inc.,* 259 Cal.App.2d 434 [66 Cal.Rptr. 361]; *Keegan* v. *Kaufman Bros.,* 68 Cal.App.2d 197 [156 P.2d 261]; and *Meadows* v. *Hampton Live Stock Com. Co.,* 55 Cal.App.2d 634 [131 P.2d 591]; they are clearly distinguish-

---

[6]The last clause of finding 3 (see *supra,* fn. 1) is consistent with a finding negating any intention by plaintiff to extend exclusive credit to Cipollo. Defendant filed no objections to the findings.

[7]"Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer."

able because, although they involve sales of livestock, they pertain to issues relating to who had proper title to converted animals; none involves a suit against a principal whose agent has been guilty of any delict.

After the default judgment against Cipollo was entered plaintiff examined him in a debtor's proceeding. Therein Cipollo testified under oath that he had made the cattle purchases at issue "for and on behalf of" defendant. This testimony was incorporated into a transcript by the court reporter who was present, and the transcript was offered by plaintiff in this cause for the purpose of impeaching Cipollo's testimony herein which could be construed as denying any agency-principal relationship in respect to the three cattle purchases. Over objection the trial court permitted the contents of the transcript to be read into the record and received in evidence as an exhibit. Appellant cites this as error under the principle that extrajudicial statements of an agent not made in the presence of the principal are inadmissible to prove either the fact of his agency (*Hilyar* v. *Union Ice Co.,* 45 Cal.2d 30, 42 [286 P.2d 21]; *Shehtanian* v. *Kenny,* 156 Cal.App.2d 576, 580 [319 P.2d 699]) or the extent of his authority[8] (*Deicher* v. *Corkery,* 205 Cal.App.2d 654, 660 [23 Cal.Rptr. 270]; *Vind* v. *Asamblea Apostolica, Christo Jesus,* 148 Cal.App.2d 597, 604 [307 P.2d 85]).

Cipollo's statements in the transcript do not appear to have been extrajudicial because they consisted of testimony given by him under oath and pursuant to a judicial proceeding. Such testimony is admissible to prove agency and the scope of authority. " '[A]gency cannot be established by the declarations of the agent *not under oath.* . . .' " (Italics ours.) (*Hilyar* v. *Union Ice Co.,* 45 Cal.2d 30, 42 [286 P.2d 21].) "While the *extrajudicial declarations* of an agent are not admissible to prove his agency or the extent of his authority [citation], his *testimony* is competent to prove these facts." (Court's italics.) (*Deicher* v. *Corkery,* 205 Cal.App.2d 654, 660 [23 Cal.Rptr. 270].) " 'In other words, "the testimony of an agent sworn as a witness in a case, when the question of his agency is involved, is competent to establish it and its extent and nature." [Citations.]' " (*Gerlinger Foundry* v. *Crescent G.D. Co.,* 108 Cal.App.2d 185, 190 [238 P.2d

---

[8]Defendant also contends that Cipollo's testimony should not have been admitted under section 2019, subdivision (a) (1), Code of Civil Procedure which provides that a party desiring to take the deposition of any person "shall give notice in writing to every other party to the action"; or under section 2016, subdivision (d) which provides that a deposition or a portion thereof, "may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof." However, this is not a deposition, nor was defendant, who was not a party to the cause involving the debtor's examination, entitled to notice thereof.

608]; *Ford* v. *Lou Kum Shu,* 26 Cal.App. 203, 208 [146 P. 199].) In *Greenwell* v. *Caro,* 114 Cal.App.2d 35 [249 P.2d 573], plaintiffs obtained a default judgment; the defendants filed affidavits in support of a motion to vacate the default. In one of the affidavits affiant declared himself to be an agent of the defendants. The trial court granted the motion to vacate and on appeal plaintiffs urged that the affidavit could not be relied upon to establish the agency because it was an "extrajudicial" statement. The court said at page 38: "Even though a witness' extrajudicial statements may not be admissible to prove the fact of his agency, that fact, when it does not depend upon a writing, may be shown upon the trial by the testimony of the agent himself (*Syar* v. *United States Fidelity & Guar. Co.,* 51 Cal.App.2d 527, 531 [125 P.2d 102]). It follows that Taylor's statements, in his affidavit, concerning his agency and that of his company, were competent to prove the agency." Although the foregoing cases involved statements by the agent given under oath in the same cause in which the fact of his agency was at issue, in the absence of authority to the contrary, we believe the same principle to be applicable here even though Cipollo's sworn testimony was given in a collateral proceeding arising out of a separate cause but involving the same factual situation and in which the question of his agency arose, but not directly. However, in the light of ample evidence of the agency in the record and the inferences in this respect which reasonably could be drawn therefrom by the trial court and by which we are bound,[9] coupled with appellant's concession herein that he was a disclosed principal and another, that "The only conflicting testimony tends to support a finding of actual agency." The receipt of the transcript in evidence, even if error, was not prejudicial.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied December 10, 1974, and appellant's petition for a hearing by the Supreme Court was denied February 6, 1975.

---

[9]"The existence of agency is a question of fact for the trial court. (*Brokaw* v. *Black-Foxe Military Institute* (1951) 37 Cal.2d 274, 278 [231 P.2d 816].)" (*Burr* v. *Capital Reserve Corp.,* 71 Cal.2d 983, 995 [80 Cal.Rptr. 345, 458 P.2d 185].)